1  JOHN E. SCHREIBER (261558)
   WINSTON & STRAWN LLP
2  333 S. Grand Avenue #3800
   Los Angeles, CA 90071-1543
3  Telephone: (213) 615-1700
   Facsimile: (213) 615-1750
4  Email: jschreiber@winston.com

5  JEFFREY L. KESSLER (*pro hac vice*)
   A. PAUL VICTOR (*pro hac vice*)
6  GEORGE E. MASTORIS (*pro hac vice*)
   WINSTON & STRAWN LLP
7  200 Park Avenue
   New York, NY 10166-4193
8  Telephone: (212) 294-6700
   Facsimile: (212) 294-4700
9  Email: jkessler@winston.com

10 Attorneys for Plaintiffs
   HARMONI INTERNATIONAL SPICE, INC. AND
11 ZHENGZHOU HARMONI SPICE CO., LTD.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HARMONI INTERNATIONAL SPICE, INC., a California corporation, and ZHENGZHOU HARMONI SPICE CO., LTD., a corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> WENXUAN BAI, an individual, JICHENG YE, an individual, RUOPENG WANG, an individual, ROBERT T. HUME, an individual, JOEY C. MONTOYA, an individual, STANLEY CRAWFORD, an individual, AVRUM KATZ, an individual, HUAMEI CONSULTING CO., INC., a corporation, HUAMEI CONSULTING CO., LTD., a corporation, KWO LEE, INC., a corporation, SHUZHANG LI, an individual, C AGRICULTURE GROUP CORP., a corporation, HEIBEI GOLDEN BIRD TRADING CO., LTD., a corporation, QINGDAO TIANTAIXING FOODS, CO., LTD., a corporation, JINXIANG HEJIA CO., LTD., a corporation, QINGDAO LIANGHE INTERNATIONAL TRADING CO., LTD., a corporation, CHEN HONGXIA, an individual, JIN XIA WEN, an individual, MINGJU XU, an individual, CAI DU, an individual, QINGHUI ZHANG, an individual, LUCY WANG, an individual, <br><br> Defendants. | **Case No.** 2:16-cv-00614-BRO-ASx <br><br> Hon. Beverly Reid O'Connell <br><br> **FIRST AMENDED COMPLAINT FOR:** <br> 1) **Violation of RICO (18 U.S.C. § 1962(c));** <br> 2) **Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 *et seq*.);** <br> 3) **Unfair Competition - California Common Law;** <br> 4) **Trade Libel;** <br> 5) **Tortious Interference with Contractual Relations;** <br> 6) **Intentional Interference With Prospective Economic Advantage.** <br><br> **DEMAND FOR JURY TRIAL** |

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Plaintiffs Harmoni International Spice, Inc. ("Harmoni") and Zhengzhou Harmoni Spice Co., Ltd. ("Zhengzhou Harmoni") respectfully allege, with knowledge as to their own actions and on information and belief as to all other allegations, including but not limited to the actions of others, as follows:

## I. **INTRODUCTION**

1. This is a civil action for wire and mail fraud and extortion perpetrated in connection with Defendants' unlawful conspiracy to dominate the United States market for fresh Chinese garlic and to economically cripple Zhengzhou Harmoni, which produces and exports fresh garlic to the United States from the People's Republic of China ("China"), as well as its parent Harmoni, which imports Zhengzhou Harmoni's garlic. Plaintiffs seek injunctive relief, damages, and penalties under state and common laws regarding unfair competition, and treble damages and attorneys' fees under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").

2. The story begins in 1994, when the Department of Commerce (the "DOC") issued an antidumping order covering fresh garlic from the People's Republic of China (the "Chinese Garlic Order").

3. As a result of the Chinese Garlic Order, exporters of Chinese garlic were assessed hefty antidumping duties which had to be deposited by their importer customers in the United States.

4. Since that time, the DOC has conducted annual administrative reviews of companies subject to the Chinese Garlic Order as well as reviews of "new shippers" of Chinese garlic (*i.e.*, companies who did not export garlic to the United States during the original review period and are not affiliated, directly or indirectly, with companies which did).

5. As a result of these reviews, the vast majority of Chinese garlic is still subject to hefty duties. This is due largely to persistent violations of U.S. antidumping regulations by Chinese garlic exporters.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

6.     The notable exception is garlic imported by Harmoni from Zhengzhou Harmoni, its wholly-owned Chinese subsidiary.  Upon commencing its exportation of garlic to the United States in 2001, Zhengzhou Harmoni legitimately obtained a zero-duty rate under the U.S. antidumping laws and has maintained that rate through the present day.

7.     As a result, Zhengzhou Harmoni enjoys a lawful advantage in the U.S. marketplace compared to other Chinese garlic exporting companies, which are subject to a range of higher rates.

8.     Similarly, due to its position as Zhengzhou Harmoni's parent and exclusive importer, Harmoni enjoys an advantage in the U.S. marketplace compared to other importers, all of whom are subject to significant antidumping duty deposits and assessments due to their exporter suppliers' continued dumping.

9.     Rather than comply with U.S. antidumping laws in order to improve their competitive position, Defendants participated in an Enterprise which embarked upon a series of unlawful and illegal acts designed to defraud the DOC, U.S. Customs and Border Protection ("Customs"), the agency charged with administering the DOC's antidumping orders, and the United States Court of International Trade (the "CIT").

10.     Specifically, Defendants repeatedly made false statements and submitted forged documents in order to obtain for themselves (and a number of other companies within their control) undeservedly favorable dumping duties and to flood the U.S. market with garlic sold at less than fair value while severely eroding Plaintiffs' market share.

11.     Defendants have also made a series of false or fraudulent statements regarding Harmoni and Zhengzhou Harmoni in order to damage Plaintiffs' relationships with both their customers and the U.S. government, and with the intent of forcing Plaintiffs to pay millions of dollars for Defendants to cease engaging in such conduct.

3

12.     Through such illegal conduct, Defendants intended to (and did) benefit themselves at Plaintiffs' expense.

13.     Defendants' scheme is driven by Defendant Wenxuan Bai ("Bai"), a Chinese businessman who at all relevant times has owned and/or controlled, either directly or through family members, a number of different entities exporting fresh garlic to the United States, including, but not limited to, Defendant Qingdao Tiantaixing Co., Ltd. ("QTF"), Defendant Qingdao Lianghe International Trading Co., Ltd. ("Lianghe"), and Qingdao Xintianfeng Foods Co., Ltd. ("QXF").  Bai has also been actively involved in the business operations of Defendant Heibei Golden Bird Trading Co., Ltd. ("Golden Bird"), another large Chinese exporter whose business operations are intertwined with those of QTF, QXF, and Lianghe.

14.     Defendant Jicheng Ye ("Ye") is a Chinese businessman acting in concert with Bai in an effort to destroy Plaintiffs' competitive position in the U.S. garlic market and to replace Zhengzhou Harmoni's exports with garlic exported by his own companies or those of his co-conspirators.  At all relevant times, Ye has owned and/or controlled a number of different entities exporting fresh garlic to the United States, including but not limited to Defendant Jinxiang Hejia Co., Ltd., ("Hejia") and Sunny Import and Export Limited ("Sunny Import/Export").   Ye also owns or controls Huameng Import & Export Co. ("Huameng"), an exporter and alleged producer of fresh garlic currently participating in a new shipper review before the DOC.

15.     Bai and Ye are actively assisted by Defendant Ruopeng Wang ("Wang"), a Chinese businessman who controls and operates Golden Bird.

16.     Of particular importance, Wang also controls Huamei Consulting Co., Ltd. ("Huamei China"), a consulting company based in China that provides assistance to Chinese exporters and their affiliates (including companies owned by Bai and Ye) in their dealings with the DOC, and Huamei Consulting Co., Inc. ("Huamei USA"), the U.S. branch of Huamei China.  Huamei China and Huamei USA are collectively referred to herein as "Huamei."

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

17.    In providing these services, Huamei works closely with Hume & Associates LLC ("Hume & Associates"), a law firm based until recently in Ojai, California, and now headquartered in El Prado, New Mexico.  According to its website, Hume & Associates "consults on international trade and U.S. customs cases, which include assisting overseas clients expand their business in the United States."

18.    As a general matter, Huamei and its employees act as liaisons between the Chinese garlic exporters owned or controlled by Defendants Bai, Ye, and Wang (referred to as the "Chinese Garlic Association") and the lawyers at Hume & Associates, who act on behalf of those companies in the United States.  (For some of the relevant time period, Huamei and its Chinese clients were also assisted in the United States by Zhao-King LLC, d/b/a Trade Bridge ("Trade Bridge"), a now-defunct law firm affiliated with Hume.)

19.    The lawyers at Hume & Associates working to further the ends of the Chinese Garlic Association in the United States include Defendant Robert T. Hume ("Hume"), who owns the firm, and Defendant Joey C. Montoya ("Montoya").  The ties between Hume and Huamei are very tight.  Hume is the registered agent for Huamei USA in the State of California, and Hume & Associates' former offices in Ojai were adjacent to those of Huamei USA.

20.    Beginning no later than November 2009, Bai, Ye and Wang, through Hume & Associates, repeatedly defrauded the DOC, Customs, and the CIT in order to obtain favorable rates for an endlessly changing string of nominally different Chinese Garlic Association companies within their control.  Among other things, Hume & Associates misled the DOC and Customs as to the ownership of one or more of these companies, submitted false affidavits regarding the provenance of the garlic being shipped to the United States and provided forged documents in order to demonstrate compliance with Chinese laws governing exportation, while at the same time attempting to falsely implicate Plaintiffs in similar illegal activities.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

21.     In many cases, Defendants formed new corporate entities or revitalized dormant ones in order to obtain coveted "new shipper" designations, which are generally accompanied by favorably low antidumping duty rates based upon minimal initial shipments of garlic.

22.     Upon obtaining such low rates, however, these putatively "new shippers" would then begin exporting huge amounts of fresh garlic to the United States, most of which was sourced from a wide variety of producers who were not "new shippers" and whose exports should have thus been subject to much higher rates.  This sleight of hand enabled U.S. importers of that garlic to "dump" Chinese garlic into the U.S. market for less than fair value, increasing Defendants' market share at the expense of both Plaintiffs and the domestic garlic industry.

23.     Of course, when these "new shippers" were reviewed by the DOC and assessed higher duties as a result of dumping or disclosure violations, Bai, Ye, and Wang would cease using them to export garlic and simply hang a different shingle on their operations, either by opening up nominally different additional entities or going back to dormant ones.   Through Huamei, Hume, and Montoya, these "new" companies would then fraudulently obtain new shipper status and favorable rates, and the cycle would continue.

24.     If and when the DOC discovered these scams (which did not always occur) and instructed Customs to collect the difference between the deposits based on the lower antidumping rates and the amount that should have been paid for the garlic actually shipped to the United States, the importers had either ceased operations entirely or lacked sufficient assets to pay the proper amount.

25.     In other cases (such as garlic imported by Defendant Kwo Lee, Inc. ("Kwo Lee"), an importer based in St. Louis, Missouri and tied to Bai, Ye, and Wang), the importer would continue its fraudulent statements in proceedings initiated before the CIT in an effort to maintain the fraudulently-obtained lower rate despite the DOC's findings.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

6

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

26.     Defendants increased market share for the Chinese Garlic Association companies and injured Plaintiffs and domestic garlic producers in other ways as well.

27.     First, both Bai and Wang have engaged in conduct meant to facilitate the ability of companies under their ownership and/or control to fraudulently ship products under a more favorable antidumping rate than the one to which they are entitled.  For example, when Golden Bird, which is controlled by Wang, was assessed a punitive dumping rate by the DOC, the fresh garlic it had previously exported was simply re-routed (without even changing the Golden Bird label) through Bai's company QTF, which at the time was subject to a more favorable rate.

28.     Second, in an attempt to stave off the imposition of hefty duties on various existing Chinese Garlic Association companies before the DOC, Hume has made fraudulent statements and fraudulent certifications and provided false affidavits to the DOC, Customs, and the CIT with regard to his clients' compliance with applicable Chinese export regulations.

29.     Third, Hume and Montoya have recruited Defendants Stanley Crawford ("Crawford") and Avrum Katz ("Katz"), two New Mexico-based hobby farmers with no financial stake in the outcome of the U.S. antidumping administrative review process, to file baseless review requests containing false and misleading allegations against Zhengzhou Harmoni.  These filings are part of an ongoing effort to force upon Zhengzhou Harmoni the significant expense and burden associated with administrative review, strip it of its favorable rate, and increase the market share of Hume's real clients-in-interest:  Bai, Ye, Wang, and the Chinese corporations under their control.

30.     The review requests made by Crawford and Katz, which Hume informed the two farmers he would handle on a *pro bono* basis, are actually being bankrolled by a $1.6 million "war chest" set up at Hume and Wang's instigation by the Chinese Garlic Association in September 2014.  This war chest was created for the explicit purpose of destroying Plaintiffs' business in the United States and replacing Harmoni

7

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

and Zhengzhou Harmoni's exports with Chinese garlic exported by companies controlled by Bai, Ye, and Wang unless Plaintiffs agree to meet certain cash payment demands of the members of the Chinese Garlic Association.

31.     Finally, Defendant C Agriculture Group Corp. ("C Agriculture"), a fresh garlic reseller run by Defendants Jin Xia Wen ("Wen") and Mingju Xu ("Xu") and having close ties to Bai, Ye, Huamei, Hume, and other Defendants, has injured Harmoni's reputation and tortiously interfered with its contractual relations by sending a false and defamatory letter to one of Harmoni's largest U.S. customers, Christopher Ranch L.L.C. ("Christopher Ranch").  In the letter, C Agriculture levels a number of baseless claims against Harmoni and demands an immediate and extortionate payment of $32 million in exchange for its promise not to levy these false accusations more publicly and irreparably damage Harmoni's reputation and relationships with its customers.

32.     Defendants' fraudulent acts perpetrated in furtherance of a scheme to injure Plaintiffs and improperly gain share in the U.S. market for fresh garlic are precisely the types of conduct that the RICO Act and the unfair competition laws have made unlawful.

## II.     JURISDICTION AND VENUE

33.     This Complaint is filed, and this Court has subject matter jurisdiction of the matters complained of, pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

34.     This Court has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to 28 U.S.C. § 1367(a), as the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

35.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants Hume and Huamei USA resided in the District during some or all of the relevant time period, a substantial part of the events giving rise to the claims occurred in this District, and Defendants transact business and/or

1  purposefully availed themselves to the privilege of conducting activities giving rise to
2  this action in this District.

3  **III.    DESCRIPTION OF THE PARTIES**

4  **Plaintiffs**

5  36.    Plaintiff Harmoni is, and at all times relevant was, a California
6  "Subchapter S" Corporation with its principal place of business in the City of
7  Industry, County of Los Angeles, State of California.  Harmoni is engaged in, *inter*
8  *alia*, the importation and sale of fresh garlic, including garlic bulbs and peeled garlic,
9  dehydrated garlic, ginger, and paprika.  Harmoni acts as the exclusive importer of
10 Zhengzhou Harmoni's fresh garlic for the U.S. market.

11 37.    Plaintiff Zhengzhou Harmoni is a subsidiary of Harmoni which has as its
12 principal place of business the Henan Province of China.  Zhengzhou Harmoni is
13 engaged in the production, exportation, and sale of fresh garlic, including garlic bulbs
14 and peeled garlic from China to the United States.

15 **Defendants**

16 38.    Defendant Bai is an individual residing in China.  Bai is the owner of, or
17 otherwise associated with, QTF, QXF, Lianghe, and Golden Bird, all of which have
18 exported (or continue to export) fresh garlic to the United States.

19 39.    Defendant Ye is an individual residing in China.  Ye is an owner of, or
20 otherwise associated with, Sunny Import/Export and Hejia, both of which have
21 produced or sold Chinese fresh garlic for export to the U.S. market.

22 40.    Defendant Wang is an individual residing in China.  Wang owns and/or
23 controls Huamei China, Huamei USA, and Golden Bird.

24 41.    Defendant Hume is an individual residing in the City of El Prado, State
25 of New Mexico.  During some or all of the relevant time period, Hume, who is
26 admitted to practice law before the CIT, as well as in Washington, D.C., Hawaii, and
27 Virginia, resided in and had as his principal place of business the City of Ojai, County

28

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

9

of Ventura, State of California.   Hume is a principal and founder of Hume & Associates.

42.     Defendant Montoya is an individual currently believed to reside in the City of Santa Fe, State of New Mexico.   Montoya is an associate attorney with Hume & Associates and is admitted to practice law before the CIT and in New Mexico.

43.     Defendant Crawford is an individual residing in the City of Dixon, State of New Mexico.   Crawford grows garlic and other produce on his two-acre farm, known as El Bosque Garlic Farm ("El Bosque"), and sells his products at the Santa Fe Farmers Market.

44.     Defendant Katz is an individual residing in the Community of Llano, State of New Mexico.   Katz grows garlic and other produce on his farm, known as Boxcar Farm, and sells his products at the Santa Fe Farmers Market.

45.     Defendant Huamei USA is, and at all relevant times was, a California Corporation with its principal place of business in the City of Ojai, County of Ventura, State of California.   Huamei USA, an affiliate of Huamei China, works with Hume & Associates and Huamei China to provide producers, exporters, and U.S. importers of Chinese garlic with a variety of professional services relating to antidumping matters.

46.     Defendant Huamei China is, and at all relevant times was, a Chinese corporation with its principal place of business in Shijiazhuang, Heibei Province, China.   It provides Chinese producers and exporters with a variety of professional services concerning antidumping matters, including preparation of accounting records and submissions to the DOC in antidumping reviews and new shipper reviews.

47.     Defendant Kwo Lee is, and at all relevant times was, a California Corporation with its principal place of business in the City of St. Louis, State of Missouri.   Kwo Lee is engaged in the importation of fresh garlic from China for a number of companies owned and/or controlled by Bai and Wang.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

48.     Shuzhang Li ("Li"), also known as Steven Li, is an individual residing in the City of St. Louis, State of Missouri.  Li is the owner of Kwo Lee.

49.     Defendant C Agriculture is, and at all relevant times was, a New York Corporation with its principal place of business in the City of Rego Park, State of New York.  C Agriculture, which does business in the United States, including New York and California, is a distributor of fresh garlic and other spices and vegetables, including fresh garlic sold to it by members of the China Garlic Association.

50.     Defendant Golden Bird is, and at all relevant times was, a Chinese corporation with its principal place of business in China.  Golden Bird's business focuses on the import and export of various products, including garlic and other farm products, agricultural by-products, light industrial products, chemical products, electronic products, machine equipment, construction materials, and automobile products.

51.     Defendant QTF is, and at all relevant times was, a Chinese corporation with its principal place of business in China.  QTF, which is owned and/or controlled by Bai, exports farm products, particularly ginger, garlic, chili, apples, and pears to the United States.

52.     Defendant Hejia is, and at all relevant times was, a Chinese corporation with its principal place of business in China.  Hejia exports fresh garlic to the U.S. market.

53.     Defendant Lianghe is, and at all relevant times was, a Chinese corporation with its principal place of business in China.  Lianghe is a trading company involved in the purchase and export of agricultural products, including garlic.

54.     Defendant Chen Hongxia ("Chen"), an individual residing in China, is Defendant Bai's wife.  Chen is the owner of Lianghe.

55.     Defendant Jin Xia Wen ("Wen"), also known as Wennie Wen, is an individual residing in New York City, New York.  Wen is the owner of C Agriculture.

11

56. Defendant Mingju Xu ("Xu"), who is the manager of C Agriculture, is an individual residing in New York City, New York.

57. Defendant Cai Du ("Du") is an individual residing in China. Du is an employee of Huamei.

58. Defendant Qinghui Zhang ("Zhang") is an individual residing in China. Zhang is an employee of Huamei.

59. Defendant Lucy Wang ("Lucy"), also known as Jingyan Wang, is an individual residing and admitted to practice law in China. Lucy is an employee of Huamei.

60. At all times relevant to this Complaint, each of the Defendants acted as the co-conspirator, agent, or servant of each of the other Defendants, and in acting or failing to act in the manner alleged in this Complaint, each Defendant acted within the course and scope of such conspiracy or agency and with the permission, consent, approval, and ratification of each of the other Defendants. At all times relevant, each of the Defendants acted in concert with each of the other Defendants towards a common goal.

## IV.   BACKGROUND

### The U.S. Garlic Market

#### A. The U.S. Fresh Garlic Market

61. Fresh garlic, as distinguished from dehydrated and seed garlic, is garlic in either whole bulb or peeled clove form.

62. Virtually all fresh garlic grown in the United States is planted in the central agricultural valleys of California. Because of its climate, geography, and infrastructure, California is the only state in which commercial-scale production of fresh garlic in the United States takes place.

63. Chinese garlic refers to garlic grown primarily in the Shandong and Henan provinces of China. Chinese fresh garlic is planted and harvested slightly earlier than garlic grown in California and characteristically has a milder taste.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

64.     Total consumption of garlic in the United States is approximately 260,000 metric tons ("MT") each year.  The annual average production of domestic garlic is approximately 175,000 MT.

65.     Chinese garlic accounts for about 25 percent of the total U.S. fresh garlic market, with the volume of garlic imported from China totaling approximately 65,000 MT in 2014.  Garlic imported from other countries, including Argentina, Mexico, and Spain, accounted for approximately 20,000 MT in 2014.

### B. The U.S. Antidumping Regime

66.     Among other things, the U.S. antidumping laws are concerned with protecting domestic businesses from unfair and injurious competition resulting from sales of a good by a foreign producer in the United States at a price lower than the good's fair value.

67.     In particular, subtitle B of title VII of the Tariff Act of 1930 provides that antidumping duties will be imposed when two conditions are met: (a) the DOC determines that the foreign subject merchandise is being, or is likely to be, sold in the United States at less than fair value, and (b) the U.S. International Trade Commission ("ITC") determines that a domestic industry has been materially injured or is threatened with material injury by reason of imports of that merchandise.  *See* 19 U.S.C. § 1673 (1994).

68.     Interested parties, typically commercial manufacturers, producers, or wholesalers of a given product they believe is being imported into the United States and sold for less than fair value, may file a so-called "antidumping petition" with the DOC and ITC alleging that a domestic industry has been materially injured or threatened with material injury as a result of such conduct.  The DOC may also initiate an investigation of its own accord.  *See id.* § 1673a(a), (b).

69.     Upon the filing of an antidumping petition, both the DOC and ITC conduct independent, simultaneous investigations regarding the subject merchandise.  The DOC determines whether the subject imported merchandise is being sold or is

13

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

likely to be sold at less than fair value, while the ITC determines whether an industry in the United States has been materially injured or is threatened with material injury because the subject merchandise is being imported.  With the exception of the DOC's preliminary determination, a negative determination by either the DOC or ITC at any stage will result in a termination of proceedings before both agencies.

70.   The timelines of these concurrent investigations are specified by statute.

71.   Within 20 days of the filing of the petition, the DOC will determine whether the antidumping petition alleges the elements necessary for imposition of a duty.  Upon an affirmative determination, the DOC will commence the preliminary phase of its investigation.  *See id.* § 1673a(c)(2).

72.   Within 160 days of the petition's filing, the DOC will make a preliminary determination, based upon the best information available to it at the time, regarding whether there is a reasonable basis to believe or suspect that the imported merchandise is being sold or is likely to be sold at less than fair value.  *See id.* § 1673b(c)(1).

73.   An affirmative preliminary determination by the DOC prompts Customs to require a cash deposit of estimated antidumping duties or an entry bond in the equivalent value for the imported merchandise effective upon the date of publication of the preliminary determination in the Federal Register.   If the preliminary determination is negative, the DOC will nevertheless conduct the final phase of its investigation but will not require a cash deposit or bond upon importation of the subject merchandise while the investigation is pending.  *See id.* § 1673d(c)(1)(B), (d)(1)-(2).

74.   Within 75 days of the preliminary determination, the DOC will issue a final determination regarding whether the subject imported merchandise is being sold or is likely to be sold at less than fair value, effective upon the date of publication in the Federal Register.  *See id.* § 1673d(a)(1)-(2).

75.   ITC investigations relating to material injury proceed along a parallel track.

14

76.     Within 45 days of the filing of an antidumping petition by an interested party with standing, the ITC conducts the preliminary phase of its investigation and determines whether there is a reasonable indication that the domestic industry has been materially injured or is threatened with material injury by importation of the subject merchandise.  During this phase of the investigation, the ITC typically sends cost of production questionnaires to U.S. producers, U.S. importers, and foreign producers, holds a public conference in which parties supporting and opposing the petition present legal and factual arguments in support of their positions, and drafts a staff report analyzing statistical data and other relevant information collected during its investigation.  *See id.* § 1673b(a).

77.     The ITC then issues a preliminary finding, which is published in the Federal Register.  If the determination is affirmative, it includes a notice of commencement of the final phase of the investigation.  *See id.*

78.     No more than 280 days after the filing of the petition, the ITC makes a final determination of whether an industry in the United States has been materially injured or is threatened with material injury.  This final determination is effective upon the date of publication in the Federal Register.  *See id.* § 1673d(c)(3).

79.     Where both the DOC and ITC issue a final affirmative determination, an antidumping duty order is published and importers are required to post a cash deposit with Customs at the time of entry of the imported merchandise subject to the order in an amount based on the estimated weighted average dumping margin applicable to their foreign supplier, known as the "cash deposit rate."

80.     Cash deposits and customs entry bonds are meant to guarantee that Customs will receive the required duties on imports entering the United States.

81.     An importer subject to an antidumping order may elect to post either a single transaction bond or a continuous-entry bond.  A single transaction (or single entry) bond covers the entry of a single shipment of goods.  A continuous-entry bond has a term of one year and covers all shipments made during that time period.  The

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

15

bond value for a continuous-entry bond is calculated at 10 percent of the estimated duties, taxes, and fees to be paid over the 12-month period.

82.     Antidumping orders must be reviewed by the DOC and ITC no later than five years after they are imposed in a process known as a "sunset review."  If, during that process, the agencies find that dumping and material injury to the domestic market are likely to recur, they will issue a so-called "continuation order."  These orders are also subject to the five-year sunset review requirement.  *See id.* § 1675(c).

83.     Upon the request of an interested party, the DOC will also conduct annual administrative reviews in order to determine the actual amount of antidumping duties to be paid on shipments from the preceding year.  Such requests must be made during the anniversary month that the order was imposed, and cover the 12-month period of time prior to that anniversary month (referred to as a "period of review" or "POR").  *See* 19 C.F.R. § 351.213(b), (e) (1984).  The annual review proceedings are conducted in a manner similar to the original investigation.

84.     After receiving an appropriate request, the DOC initiates an administrative review by publishing an initiation notice in the Federal Register in the month immediately following the anniversary month.

85.     The DOC will rescind an administrative review if a party that requested a review withdraws the request within 90 days of the date of publication of notice of initiation.  *See id.* § 351.213(d).  If no interested party files a review request, the DOC typically does not initiate such a review, and the amount determined to be the estimated duty during the prior POR or original investigation will be retained by the DOC as the appropriate cash deposit rate.

86.     Domestic interested parties may request that specific companies be included in the review by the DOC.  To have standing to submit such a request, the party must be a member of the domestic industry that is protected by the antidumping order.  *See* 19 U.S.C. § 1516.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

87.   If an exporter has no shipments during a review but is included in an interested party's review request, it can file a request for rescission of the review based on a certification, signed by a person officially responsible for presentation of the actual information, that there were no shipments during the period.  Upon approval by the DOC, the review will be rescinded with respect to the particular exporter, who will retain its deposit rate received from the last period of review.  *See* 19 C.F.R. § 351.213(d)(3).

88.   A foreign exporter or producer subject to the order may also submit a request to be included in the annual review, but cannot request a review of exporters or producers other than itself.  *See id.* § 351.213(b)(2).

89.   The purpose of an annual administrative review is to calculate the precise amount by which the foreign value of a given import exceeded the price charged in the United States during the preceding year and to use that figure to assess duties on the import entries made during the review period and to recalibrate the estimated deposit rate for future imports.

90.   In conducting an administrative review, the DOC will typically evaluate the sales, costs, and pricing practices of only two or three mandatory respondents rather than each individual company named in the initiation notice.   These are typically those foreign exporters or producers subject to the order responsible for the largest number of exports to the United States over the prior POR.

91.   In order to determine the estimated duty assessment for the mandatory respondents, the DOC determines the value of the duty needed to equalize the effect of the dumping.   The DOC will compare the export price or resale price after the deduction of certain expenses and costs to determine the foreign producer's factory price.   The foreign producer's factory price is then compared to the fair value in the home market to determine a constructive value equivalent to the cost of production plus an imputed profit.   The difference between this value and the U.S. market price is used to set the antidumping margin.

92.    However, for countries the DOC has determined to have "non-market" economies ("NME"), such as China, the home market's prices are not used as a basis for comparison.  Instead, the value of the cost of production is based on a surrogate value observed in a country with a market economy.  The surrogate country must be a significant producer of comparable goods and at a level of development that is comparable to the NME country.  The DOC will then compare the factory U.S. price to the constructed price in the NME country, based on the producer's factors of production in the surrogate country.

93.    An estimated average antidumping margin, calculated by comparing the determined constructive value with the U.S. market price, is then used to determine the appropriate cash deposit rate.

94.    Should a mandatory respondent refuse to cooperate with the DOC's investigation, the DOC will assign an adverse facts available rate (an "AFA rate") for the company, which for NME countries, such as China, is normally set at a level equivalent to the country-wide antidumping rate assessed as part of the initial order.  The DOC has discretion to select the next largest company by export quantity as a replacement mandatory respondent.

95.    Once the DOC determines the cash deposit rate for each mandatory respondent company, the DOC calculates a weighted-average margin of these individual rates (which average excludes margins that are zero, *de minimis* (lower than 0.5%), or based entirely on AFA) to determine the cash deposit rate that is applicable to all other companies subject to the administrative review but not selected for individual examination.

96.    However, for NME countries, such as China, the DOC presumes that all companies within the NME country are subject to governmental control and should be assigned a country-wide antidumping duty rate unless an exporter demonstrates the absence of both *de jure* and *de facto* governmental control over its export activities.  A company in a NME country must therefore demonstrate its independence by filing a

**Winston & Strawn LLP**
**333 S. Grand Avenue**
**Los Angeles, CA 90071-1543**

separate rate application ("SRA") to be eligible for the rate determined by the weighted-average margin, upon approval by the DOC.

97.   In addition to the annual review proceedings, foreign exporters or producers who entered the U.S. market only after an antidumping order was issued and have no direct or indirect affiliation with an existing exporter or producer (and thus did not export the goods in question during the investigation which led to the initial order or during the periods of subsequent annual reviews) may request what is known as a "new shipper review."  A new shipper must apply for review with the DOC within one year of its first shipment of the goods.

98.   Prior to completion of this review, any exports made by the new shipper are subject to cash deposits at the country-wide rate.  Accordingly, a new shipper will typically hold off on shipping large quantities of goods in bulk until the DOC wraps up its review – approximately 18 months following its initiation.

99.   Further, the cash deposit rate determined in connection with a new shipper review applies only to merchandise both exported by the new shipper and produced by the company that supplied the new shipper during the new shipper review.  In other words, an exporter receiving a rate as part of a new shipper review is only permitted to export garlic provided by those producers that were identified by the exporter as part of its review.   This exporter-producer restriction is called a "combination rate."

100.  For companies that are not "new shippers" and thus either obtained individually calculated rates or weighted average separate rates during the DOC's annual reviews, there exists no exporter-producer restriction.  This means that the rate such a company is assessed during the review process applies to subject merchandise exported by the company at the time of entry, regardless of the identities of the producer(s) that supplied the exporter.  Because no particular producer-exporter combination is required, the rate applied to non-new shippers is called a "non-combination rate."

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

HARMONI INTERNATIONAL SPICE, INC. AND ZHENGZHOU HARMONI SPICE CO., LTD.'S FIRST AMENDED COMPLAINT

### *C. Antidumping Order for Fresh Garlic from China*

101.  On July 11, 1994, the DOC published its preliminary determination regarding fresh garlic from China and found the existence of "critical circumstances" for all imports of fresh garlic from China. *See Notice of Preliminary Determination of Sales at Less Than Fair Value: Fresh Garlic From the People's Republic of China,* 59 Fed. Reg. 35,310 (July 11, 1994).  As a result of this finding, importers were required to deposit antidumping duties for entries of fresh garlic into the United States on or after April 12, 1994.  In particular, the DOC determined that Chinese exporters should be subject to a country-wide antidumping rate of 376%.

102.  Following the ITC's final affirmative injury determination, on November 16, 1994, the DOC published the Chinese Garlic Order.  *See Antidumping Duty Order:  Fresh Garlic from the People's Republic of China*, 59 Fed. Reg. 59,209 (Nov. 16, 1994).  Upon publication of the Order, U.S. importers of covered garlic were required to continue paying cash deposits to Customs at a 376% rate.

103.  The original *ad valorem* country-wide antidumping duty rate of 376% was subsequently converted by the DOC to a per kilogram rate of $4.71 per kilogram of fresh garlic.

104.  A typical 40-foot container of fresh garlic exported from China contains 26,000 kilograms, or 13 MTs, of garlic.  At the country-wide rate of $4.71 per kilogram, each such container would be subject to a cash deposit or bond of approximately $122,000 at the point of entry.  A ton of fresh garlic typically sells for about $1,900, or about $2 per kilogram.  A cash deposit rate imposed at the country-wide rate – roughly 2.5 times what the garlic can fetch on the market – thus effectively serves as a commercial bar to the importation of fresh garlic.

105.  In recent years, Customs has had significant difficulty collecting unpaid antidumping duties on imports of fresh garlic from China.  As of October 2012, more than $500 million was owed to the U.S. government for uncollected antidumping duties relating solely to imports of fresh garlic from China.

106.   The vast majority of unpaid duties are owed by importers shipping in fresh garlic from companies which received relatively low rates during new shipper reviews but were later found to have violated the terms of those "new shipper" designations thereafter – usually by shipping garlic produced by companies formerly subject to the country-wide or similarly high rate.  By the time the DOC completes its subsequent review and Customs attempts to collect the duties owed, the importers responsible have either ceased doing business altogether or simply lack the assets to pay.

**D. Zhengzhou Harmoni is the Sole Chinese Exporter with a Zero Cash Deposit Rate**

107.   In 2002, Zhengzhou Harmoni requested a new shipper review for its shipment of garlic to the United States during November 1, 2001 through October 31, 2002, a period of review concurrent with POR 8 (*i.e.*, the eighth year after the initial order was entered) and received a zero duty combination rate.  *See Fresh Garlic From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 69 Fed. Reg. 33,626 (June 16, 2004).   As a combination rate, the new shipper rate was only applicable to fresh garlic both produced and shipped by Zhengzhou Harmoni.

108.   The DOC calculated a zero cash deposit rate for Zhengzhou Harmoni in the next two consecutive administrative reviews, POR 9 and 10.  As opposed to the initial cash deposit rate obtained in the New Shipper Review, the zero cash deposit rate obtained in POR 9 and 10 was calculated as a non-combination rate and thus applied to all of Zhengzhou Harmoni's shipments of garlic to the United States irrespective of the identity of the producer.  *See Fresh Garlic from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review and Final Results of New Shipper Reviews*, 71 Fed. Reg. 26,329 (May 6, 2006); *Fresh Garlic from the People's Republic of China:  Notice of Court Decision Not in Harmony with Final Results of Administrative Review and*

21

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

*Notice of Amended Final Results of Administrative Review*, 78 Fed. Reg. 44,928 (July 25, 2013).

109.   Zhengzhou Harmoni has not been the subject of an administrative review since POR 10.  As such, Zhengzhou Harmoni has maintained its zero cash deposit rate to date.  Zhengzhou Harmoni is currently the sole Chinese exporter with a zero cash deposit rate and one of only four Chinese companies with rates significantly lower than the $4.71 country-wide rate.

### E. China's Legal Framework for Inspecting and Certifying Food Exports

110.   All exporters of Chinese garlic, including Zhengzhou Harmoni, QTF, Golden Bird, Hejia, and QXF, are subject to certain Chinese regulations governing the exportation of agricultural food products.  In order to ship fresh garlic to the United States, these companies must first demonstrate compliance with those regulations.

111.   Specifically, the Law of the People's Republic of China on the Entry and Exit Animal and Plant Quarantine ("EEAPQ Law") establishes the requirements for the quarantine and inspection of animal and plant products that are imported into, or exported from, China.   The Agency tasked with enforcing the EEAPQ Law has established, in total, 35 Entry-Exit Inspection and Quarantine Bureaus ("CIQ") in China to perform inspections of all imports and exports.

112.   CIQ Bureaus issue phytosanitary certificates, which are required under Chinese law for each unique export shipment of agricultural food product, including fresh garlic.  Each certificate contains, among other things, a code issued by CIQ that is unique to the producer and identifies the facility at which the goods were produced and packed.   The certificates indicate that the goods were inspected by a Chinese authority and make it possible to trace exports to the facility at which they were produced.

113.   Additionally, EEAPQ Law requires that phytosanitary certificates be issued by the CIQ Bureau that is geographically closest to the site of production.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# V.   **FACTUAL ALLEGATIONS**

## A. *The Enterprise*

114.   At all times relevant to this complaint, Defendants and co-conspirators acted as an "Enterprise" within the meaning of 18 U.S.C. § 1961(4).

115.   The Enterprise in question exists for the purpose of illegally and unlawfully obtaining for Defendants and their co-conspirators a greater share of the U.S. fresh garlic market through the fraudulent avoidance of duties rightfully owed to the U.S. government, at the expense of Plaintiffs and domestic producers.

116.   In addition, and as a result of Plaintiffs' legitimately obtained advantage in this marketplace and their refusal to take part in the Enterprise, Defendants also conspired to cause Plaintiffs economic injury, lessening their ability to compete against the Chinese Garlic Association and greatly reducing their profits.

117.   Each of the members of this Enterprise has acted in furtherance of Defendants' scheme.

118.   At the center of this Enterprise are Bai, Ye, and Wang, Chinese businessmen who own or control a number of companies that export fresh garlic and are thus subject to the Chinese Garlic Order.

119.   Bai, Ye, and Wang formed a relationship through their contacts in the Chinese garlic industry.

120.   Bai owns and/or controls a number of companies involved in the export and production of fresh garlic in China. These companies, including but not limited to QTF, QXF, and Lianghe (which is nominally owned by Bai's wife, Chen), are part of a group of garlic exporters informally referred to as the "Chinese Garlic Association." Bai also has financial interests in Golden Bird, another exporter of fresh garlic established and controlled by Wang.

121.   Ye owns and/or controls a number of companies involved in the export and production of fresh garlic in China. These companies, including Defendants

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Hejia, Huameng, and Sunny Import/Export, are also part of the Chinese Garlic Association.

122.   Wang owns and/or controls Golden Bird, another exporter affiliated with the Chinese Garlic Association.

123.   In addition, Wang also owns Huamei, a consulting company that, together with lawyers and agents based in the United States, including Hume & Associates, assists members of the Chinese Garlic Association (and other Chinese companies) in proceedings before the DOC.

124.   Specifically, Huamei, through Wang and its other employees, Du, Zhang, and Lucy Wang, acts as an intermediary between members of the Chinese Garlic Association and Hume & Associates.   Hume & Associates, which consists of founding member Hume and associate Montoya, uses the information acquired by Huamei to represent the companies before the DOC, Customs, and the CIT to further Defendants' scheme.

125.   QTF, QXF, Lianghe, Golden Bird, and Huameng have all been represented by Hume & Associates in DOC, Customs, and/or CIT proceedings related to the Chinese Garlic Order.

126.   The Chinese Garlic Association exports garlic through various importers in the United States.

127.   In particular, QTF and Golden Bird, along with other companies controlled by Bai, have exported fresh garlic through Kwo Lee.   In or around June 2014, Wang approached Defendant Li, Kwo Lee's owner, to act as an importer of QTF's garlic.

128.   C Agriculture is another distributor of garlic in the United States working in conjunction with the Chinese Garlic Association.

129.   At times relevant to this Complaint, C Agriculture functioned as a distributor and reseller of garlic exported by both QTF and Golden Bird.

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

130.   C Agriculture is managed by and acts through Defendants Wen and Xu, both of whom are close business associates of Bai and Ye in a number of garlic-related ventures.

131.   In 2014, Hume – funded by and for the benefit of Bai, Ye, Wang, and Li – set out to identify small U.S.-based growers of garlic who would agree to initiate a costly and burdensome administrative review of Zhengzhou Harmoni by the DOC, in the hope of persuading Harmoni to pay an extortionate fee to the Enterprise in exchange for the withdrawal of that request.

132.   Specifically, Hume recruited Defendant Crawford to file an administrative review request of Zhengzhou Harmoni.  That request was withdrawn, but the following year, Hume re-recruited Crawford and also persuaded Defendant Katz to join Crawford in filing an administrative review request.  Hume agreed to provide these legal services to Crawford and Katz for free.

133.   In agreeing to do so and thus joining the Enterprise, Crawford and Katz, hobby farmers whose goods do not compete with Zhengzhou Harmoni's garlic and who thus have no economic interest in the outcome of such a review (other than any monies they are receiving from other members of the Enterprise), are acting as cats' paws for members of the Chinese Garlic Association who do not have standing to request initiation of such a review.

**B. Golden Bird Fraudulently Attempts to Maintain a Favorable Rate Despite Illegally Dumping Garlic Produced by Other Exporters at Less Than Fair Value.**

*i.   Golden Bird Obtains a Favorable New Shipper Rate in POR 13.*

134.   In 2006, Golden Bird, a company founded and controlled by Wang, began exporting fresh garlic produced by Cangshan County Hongyang Vegetable & Foods ("Cangshan") to the United States.

135.   Golden Bird did not at that time, and still does not, produce its own fresh garlic.

136.   In 2007, Golden Bird requested a new shipper review.  Its first shipment of garlic, which was produced by Cangshan and entered the United States during 2006–2007 (concurrent with POR 13), received a combination cash deposit rate of 13.83%.  *See Fresh Garlic From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 73 Fed. Reg. 56,550 (Sept. 29, 2008).  The rate applied solely to garlic exported by Golden Bird and produced by Cangshan.  Golden Bird was represented by Jasmine Zhao-King ("Zhao-King"), also known as Li Jasmine Zhao-King, and her law firm, Trade Bridge, in connection with this review.

137.   During POR 14 and 15 (covering the time period of November 2007 through October 2009), Golden Bird did not export any fresh garlic into the United States and therefore was not subject to any review by the DOC.

138.   In 2010, Golden Bird recommenced exporting fresh garlic to the United States.  For the first year, it exported garlic pursuant to the 13.83% rate it had earned as a new shipper in POR 13.

139.   Over the next two years, it was selected as a mandatory respondent and obtained favorable rates of 14 cents per kilogram and zero cents per kilogram for the 2009-2010 (POR 16) and 2010-2011 (POR 17) time periods, respectively.  *See Fresh Garlic From the People's Republic of China: Final Results of the 2009-2010 Administrative Review of the Antidumping Duty Order*, 77 Fed. Reg. 34,346 (June 11, 2012); *see Fresh Garlic From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 78 Fed. Reg. 36,168 (June 17, 2013). Golden Bird was jointly represented by Zhao-King and Hume in connection with these reviews.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

ii. *Golden Bird Continues to Defraud the DOC and Uses its Favorable Rate to Dump Goods Produced by Other Exporters at Less than Fair Value, Increasing its Market Share and Directly Harming Plaintiffs and the Domestic Industry.*

140.   The following year (POR 18), Golden Bird was once again selected to be a mandatory respondent.

141.   On September 16, 2013, Zhao-King withdrew suddenly as Golden Bird's representative in connection with the POR 18 review. *See 18th Administrative Review of the Antidumping Order on Fresh Garlic from the PRC – Withdrawal of Representation*, Sept. 16, 2013.

142.   Zhao-King was replaced as Golden Bird's counsel by Hume, who in turn was assisted by Huamei in connection with the review.

143.   During the POR 18 review, Hume, on Golden Bird's behalf, made a number of materially false statements to the DOC designed to maintain Golden Bird's prior favorable rate.

144.   These fraudulent statements – made on, *inter alia*, May 10, May 17, May 20, and May 23, 2014 – were contained in submissions filed via the DOC's "IA Access" electronic filing system and sent to the DOC via first-class mail.

145.   In particular, Golden Bird falsely stated that all of its exports of fresh garlic to the United States were produced by Cangshan and provided false information in support of this claim.

146.   Upon request by the DOC, Golden Bird was unable to reconcile material discrepancies between Chinese and U.S. customs data regarding the quantity and provenance of garlic exported to and sold in the United States by Golden Bird and its affiliates during the period of time covered by POR 18 (November 2011 through October 2012).

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

147.   On June 23, 2014, in its final determination, the DOC concluded that Golden Bird had falsified records and knowingly provided inaccurate information in its submissions for the POR 18 administrative review.  Specifically, the DOC stated, "Golden Bird's acknowledgement that it willingly reported false information to its own government bolstered our concern that it has provided inaccurate U.S. sales information to the [DOC]."

148.   More specifically, the DOC found that the Chinese declaration forms purportedly reflecting the amount of Golden Bird's exports could not be reconciled with data reflecting its sales in the United States, and that Golden Bird – through its counsel, Hume – had provided false information to the DOC in an effort to mislead it as to the identity of the producers whose garlic it had shipped to the United States in order to maintain Golden Bird's favorable antidumping rate.  *Id.*

149.   Accordingly, the DOC directed Customs to assess an AFA rate of $4.71 per kilogram on POR 18 imports of fresh garlic exported by Golden Bird and to require deposits of estimated dumping duties at that rate for import entries made on or after the date of publication of the final results.  *See Fresh Garlic From the People's Republic of China: Final Results and Partial Rescission of the 18th Antidumping Duty Administrative Review, 2011-2012*, 79 Fed. Reg. 36,721 (June 30, 2014).

150.   The discrepancy between Golden Bird's Chinese declarations and its U.S. sales data stemmed from Golden Bird's undisclosed exports of garlic produced and packed by Chinese fresh garlic producers other than Cangshan, the sole producer identified by Golden Bird as a supplier.  These other producers could not realistically export directly to the United States because they had been assigned much higher dumping rates, including the $4.71 AFA rate.

151.   In order to have the other producers' fresh garlic imported into the United States without deposit of such duties, Golden Bird agreed to act as exporter of their fresh garlic, using its more favorable rate, in return for hefty commissions undisclosed to the DOC and Customs.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

152.   Thus, in exchange for these very significant payments from other producers, Golden Bird agreed to and did submit fraudulent documentation to Customs falsely averring that Golden Bird itself had produced and packed the fresh garlic it had obtained from these other companies.

153.   POR 18 was not the first time period during which Golden Bird – which has never produced any garlic of its own – engaged in this unlawful behavior.

154.   In fact, between 2009 and 2013, including when it was purportedly a "new shipper," Golden Bird exported to the United States significant amounts of fresh garlic at a rate far lower than the country-wide rate to which that garlic would have been subject had it been shipped by other exporters, thus facilitating the sale of that garlic at far less than fair value to the detriment of Plaintiffs and domestic producers.

155.   This included fresh garlic produced by a number of companies owned or controlled by Bai, including, but not limited to, QTX and Lianghe.

156.   Golden Bird continued to ship large quantities of fresh garlic to the United States at the zero cash deposit rate until the publication of the final results of POR 18 in June 2014.  After that date, Golden Bird ceased shipments to the United States.

157.   Because Golden Bird's shipments had continued until June 2014, however, it was compelled to participate in the POR 19 and POR 20 reviews.  Golden Bird failed to cooperate with either of those DOC reviews and was again assigned an AFA rate of $4.71 per kilogram.

158.   These fraudulent acts to obtain and maintain lower dumping duties enabled Golden Bird to charge improperly low prices for the garlic it was exporting and directly impacted Plaintiffs by reducing their sales and profits and causing them economic harm.

159.   As a result of this fraudulent scheme, Plaintiffs incurred tens of millions of dollars in damages due to lost sales between November 1, 2009 and June 30, 2014.

1   The resulting lost business to Plaintiffs was the direct and proximate result of Golden
2   Bird's fraudulent behavior.

3   **C.** ***QTF Replaces Golden Bird and Continues the Chinese Garlic Association's***
4   ***Pattern of Making Fraudulent Submissions to Secure Unfairly Low***
5   ***Antidumping Rates.***

7      *i.  QTF Submits False Documentation, Including Forgeries of*
8         *Official Chinese Government Documents, to the DOC, Customs,*
9         *and the CIT in Order to Gain a Larger Share of the U.S. Market*
10        *and Damage Plaintiffs.*

   160. After Golden Bird received the AFA rate in POR 19 and 20, it was
replaced by two other companies controlled by Bai, QTF and Jining Yongjia Trade
Co., Ltd. ("Yongjia"), exporters of fresh garlic who in 2008 had achieved new shipper
rates of 32.78%, equivalent to $0.35 per kilogram (QTF), and 18.88%, equivalent to

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

30

$0.24 per kilogram (Yongjia).[1]

161.   QTF had first applied for a new shipper review in 2007 – the same year as Golden Bird – and received a $0.35 per kilogram combination rate for that year (POR 13).   *See Fresh Garlic From the People's Republic of China: Final Results of and Rescission, in Part, of Twelfth New Shipper Reviews*, 73 Fed. Reg. 56,550 (Sept. 29, 2008).  QTF was also represented by Zhao-King in connection with this review.

162.   From POR 14 through POR 16, QTF was represented by Zhao-King and filed no shipment certificates with the DOC, thus maintaining its $0.35 per kilogram rate.

---

[1]   Yongjia would have been a viable candidate to replace Golden Bird, but Defendants' purported scheme failed to succeed before the DOC and CIT.  Yongjia exported garlic produced by Jinxiang County Shanfu Frozen Co., Ltd. ("Shanfu II") in POR 20 through a purported combination rate of an alleged related entity.  In particular, Yongjia and Jinxiang County Shanfu Frozen Co., Ltd. ("Shanfu I"), had obtained an 18% (converted as $0.24 per kilogram) combination antidumping rate in the new shipper review covering the period of November 1, 2006-April 30, 2007, concurrent with POR 13.  The Chinese authorities subsequently closed Shanfu I in or around 2011.  After Shanfu I's closure, Yongjia registered a new business entity under Shanfu I's corporate name, Shanfu II.  In actuality, there was no unity of interest between Shanfu I and Shanfu II.  Shanfu II had a different location, different management personnel, and different facilities.  However, Yongjia misrepresented to Customs that the garlic it exported during POR 20 was produced by Shanfu II and, as a supposed related entity, was covered by Shanfu I's prior combination rate of $0.24 per kilogram.  Customs rejected Yongjia's claim and refused to apply Shanfu I's combination rate.  Instead, Customs imposed a single transaction bond at the country-wide rate.  Consequently, Yongjia applied for a Changed Circumstances Review, requesting the DOC to determine that Shanfu II was the successor in interest to the Shanfu I entity in conjunction with the POR 20 review.  On September 24, 2015, the DOC determined that Shanfu II was not a successor-in-interest to the Shanfu I entity and that, as a result, Yongjia's exports of garlic produced by Shanfu II would be subject to the country-wide rate.  *See Fresh Garlic From the People's Republic of China: Final Results of the Changed Circumstances Review*, 80 Fed. Reg. 57,579 (Sept. 24, 2015).

31

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

163.   From POR 17 through 19, QTF was still not subject to review pursuant to its claims that it did not ship fresh garlic to the United States during the relevant periods, based upon submissions certified as accurate by Zhao Zhenqing ("Zhao"), the alleged manager of QTF, and further certified as accurate by QTF's counsel, Zhao-King (POR 17-18) and Hume (POR 19).

164.   As a result of those certifications, QTF maintained its original $0.35 per kilogram combination rate through POR 20 (2013-14), when – upon the DOC's imposition of the punitive AFA rate of $4.71/kilogram on Golden Bird – it was revivified by Bai and once again began shipping fresh garlic.

165.   As a "new shipper" subject to a combination rate, QTF was and remains restricted to shipments of only its own production of fresh garlic.  Any shipments it makes of garlic produced and packed by other producers is subject to the country-wide rate of $4.71 per kilogram.

166.   Nevertheless, Bai, in consultation with Wang and Ye, caused QTF to take over Golden Bird's role by fraudulently and illegally shipping large volumes of other producers' fresh garlic under the favorable rate it had obtained as a "new shipper" some six years earlier.

167.   Indeed, despite the fact that Golden Bird has not exported any garlic to the United States since 2014, fresh garlic contained in bags bearing the Golden Bird label continues to be shipped by QTF and offered for sale in U.S. markets.

168.   QTF, through Hume, its agent in the United States, also adopted Golden Bird's pattern of submitting fraudulent documents to government officials and agencies.

169.   Specifically, for the period from November 11, 2013 through October 31, 2014, in order to assist its importer, Kwo Lee, in qualifying for QTF's favorable rate of $0.35 per kilogram, QTF provided incomplete Chinese government phytosanitary certificates to Customs in an attempt to convince that agency that all garlic shipped by QTF was also produced by QTF.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

170.   However, because QTF was ultimately unable to substantiate this claim, on August 19, 2014, Customs required Kwo Lee to submit a single transaction bond at a face value sufficient to cover the applicable dumping rate of $4.71 per kilogram for its entries, because, in accordance with DOC instructions, that rate would apply to QTF exports of garlic produced and packed by any company other than QTF itself.

171.   Less than a month later, on September 16, 2014, Kwo Lee filed suit with the CIT challenging this single transaction bond requirement and seeking a temporary restraining order preventing Customs from requiring such a bond.   Kwo Lee was represented by Hume in connection with the lawsuit.

172.   In its motion for a temporary restraining order, Kwo Lee claimed that it was customary among Chinese agricultural companies (such as producers of fresh garlic) to submit incomplete phytosanitary certificates, which are documents required in conjunction with the exportation of agricultural goods, to Chinese regulators.   *See* Plaintiff's Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, *Kwo Lee v. United States*, 1:14-cv-00212-DCP (Dkt. 7) (Sept. 16, 2014).

173.   As purported evidence for this claim, and in an attempt to damage Zhengzhou Harmoni's reputation, imperil its favorable zero antidumping rate and cause Customs to require Harmoni to post a single transaction bond, Kwo Lee falsely

averred that Zhengzhou Harmoni also had a practice of submitting such incomplete certificates to the Chinese government.[2]

174.   On October 2, 2014, in further support of its lawsuit against Customs, Kwo Lee filed with the CIT an affidavit executed by Zhao Zhenqing, an individual purporting to be the Manager of QTF.  *See* Declaration of Zhao Zhenqing, *Kwo Lee v. United States*, 1:14-cv-00212-DCP (Dkt. 31) (Oct. 2, 2014).

175.   In his affidavit, Mr. Zhao averred that it was the practice of some of the government officials in China to leave the Additional Declaration column of the phytosanitary certificates blank, and that submitting incomplete phytosanitary certificates was a normal practice of other Chinese companies, including Zhengzhou Harmoni.   In order to "substantiate" these false allegations, Mr. Zhao's affidavit attached a number of forged documents it identified as valid Zhengzhou Harmoni phytosanitary certificates.

176.   Mr. Zhao's affidavit was filed by Hume on behalf of Kwo Lee via the CIT's case management and electronic court filing system.

177.   On the basis of the foregoing documentation, QTF's motion for a TRO was granted on October 16, 2014.  This allowed QTF to continue to export fresh garlic under its prior 35 cent cash deposit rate, without the requirement of a single

---

[2]   At the same time Kwo Lee filed the motion for a TRO against the DOC, Hume also filed a motion for a TRO on behalf of International Fresh Trade Corp. on September 16, 2014, arguing that Customs was wrongfully requiring it to post a single transaction bond for the fresh garlic exported by Yongjia and produced by Shanfu II.  In support of its motion, Hume filed the same fraudulent Zhengzhou Harmoni phytosanitary certificates and declaration of the alleged manager of QTF, Zhao Zhenqing, as submitted in the Kwo Lee proceedings.   Hume voluntarily dismissed the case and these documents were later marked by the court clerk as misfiled.  Hume filed a stipulation of dismissal on January 12, 2015.  However, the fraudulent certificates and false statements in the misfiled document remained part of the public record until CIT removed the record in early January 2016.  *See* Declaration of Zhao Zhenqing, *Int'l Fresh Trade Corp. v. United States*, 1:14-cv-00213-DCP (Dkt. 28) (Sept. 30, 2014).

transaction bond.  During the time period from October 2014 to June 2015, QTF exported approximately 29 containers of fresh garlic to the United States, with a total value of approximately $19.2 million.

178.   After learning of Mr. Zhao's submission, in a complaint filed on January 3, 2015, Zhengzhou Harmoni brought the forged phytosanitary certificates and Mr. Zhao's declaration to the attention of the Shandong CIQ, the Chinese government agency charged with inspecting all shipments of agricultural products as a prerequisite to obtaining clearance from Chinese Customs to export the fresh garlic to the United States.

179.   On March 6, 2015, the Shandong CIQ issued its preliminary findings in the matter, determining that the phytosanitary certificates filed by Kwo Lee did not conform to the certificates issued by CIQ.  As a result, CIQ initiated a full investigation and temporarily suspended QTF's export privileges.

180.   CIQ issued its final determination on May 20, 2015, concluding that the phytosanitary certificates attached to Mr. Zhao's affidavit and submitted to the CIT by Kwo Lee were forgeries.

181.   The CIQ investigators also concluded that Mr. Zhao held no managerial position at QTF during the relevant periods.

182.   Mr. Zhao never signed any certifications in connection with the Kwo Lee lawsuit or any antidumping review.  In fact, Mr. Zhao had no knowledge of the lawsuit, U.S. antidumping proceedings involving QTF, or any of the facts set forth in his purported 2014 affidavit.

183.   Indeed, a later criminal investigation in China confirmed that Mr. Zhao was not a manager at QTF and in fact held no position or title at the company.  In addition, it was determined that Mr. Zhao's signature did not match those on any of the documents submitted to the DOC and the CIT in his name, including a number of submissions filed by Hume as counsel to QTF in the POR 19 through POR 21 administrative reviews before the DOC.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

184. During its investigation, the CIQ also discovered proprietary Golden Bird documents and financial information on the hard drives of computers owned by QTF, dealing with various financial transactions between the two companies, and providing further evidence of the web of cooperation connecting Bai, Wang, and members of the Chinese Garlic Association.

185. On June 12, 2015, after submission of additional evidence regarding the falsity of Kwo Lee's claims, the CIT lifted its order, holding that the single transaction bond requirement imposed by Customs had not been arbitrary or capricious. In order to secure the U.S. government against potential losses stemming from Kwo Lee's subsequent importations of fresh garlic without the posting of bonds, the CIT required that Kwo Lee post a $1 million bond pending the final results for QTF in the DOC's POR 20 review.

186. In the meantime, and until the DOC's final results in POR 20, scheduled to be announced in June 2016, QTF garlic continues to be subject to a rate of $0.35 per kilogram. As a result, QTF is selling large amounts of fresh Chinese garlic at less than fair value, directly harming Plaintiffs, which have seen their revenues and profits reduced as a result.

ii. *Since the Court's Ruling, QTF Has Continued to Unlawfully Ship Fresh Garlic on Behalf of Producers Who Should Be Subject to a Much Higher Rate in Order to Benefit the Chinese Garlic Association and Damage Harmoni.*

187. After the injunction fraudulently obtained by Kwo Lee was lifted, QTF began submitting phytosanitary certificates to Customs that appeared to conform with CIQ regulations.

188. Although Customs has accepted these certificates, which identify QTF as the producer of the fresh garlic being exported to the United States, QTF lacks the

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

production facilities to produce the amount of fresh garlic it is claiming to have produced to Customs.

189.   Indeed, QTF has simply continued to unlawfully ship garlic produced by other Chinese companies, including fresh garlic supplied by other members of the Chinese Garlic Association who are owned or controlled by Bai, including but not limited to Lianghe, in violation of its combination rate restriction.

190.   To evade the country-wide rate for garlic produced by other companies and maintain its ability to continue shipping garlic at a favorable rate, QTF has submitted fraudulent phytosanitary certificates indicating that QTF itself is the producer of the garlic being exported.

191.   QTF and its ultimate owner, Bai, have obtained these phytosanitary certificates by bribing local CIQ officials in China.

192.   Although garlic shipped by these other producers would normally be subject to the country-wide rate of $4.71 per kilogram, QTF has been able to unlawfully ship its garlic at a rate of 35 cents, thus flooding the U.S. market with garlic sold at less than fair value and causing significant economic harm to Plaintiffs as well as domestic producers.

193.   In fact, QTF's shipments of fresh garlic to the United States at $0.35 per kilogram were occasioned by fraud, as QTF should have been subject to a rate of $4.71 per kilogram as a result of its improper certifications of no shipments, starting with the final results of POR 17 (covering the period November 1, 2010 through October 31, 2011), when Mr. Zhao, as "Manager" of QTF, purportedly certified that the company had made no shipments of fresh garlic to the United States during the review period.

194.   Since Mr. Zhao was in fact not the Manager of QTF, did not sign the certifications, and had no knowledge of QTF's fresh garlic business, the required company certifications were invalid.  As such, QTF should have been assigned a rate of $4.71 per kilogram as of June 17, 2013, the date of the final results of POR 17.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Therefore, all subsequent shipments of fresh garlic to the U.S. market by QTF, including and up to the POR 20 review period, were required to be secured by antidumping deposits of $4.71 per kilogram – a rate that would have effectively made importation of QTF garlic, regardless of who produced that garlic, commercially unfeasible.

195.   QTF continued to make these fraudulent claims to the DOC in connection with POR 20, during which it was again represented by Hume.

196.   In particular, QTF stated that it produced all of the garlic it sold during the POR at its facility in Jiaozhou City.

197.   In support of its claim that it produced all of the garlic it exported to the United States, QTF claimed, contrary to applicable Chinese law, that the CIQ did not require physical inspection at the place of exportation, but rather that inspections could be performed electronically.

198.   These fraudulent statements – made on, *inter alia*, February 2, May 5, May 20, and November 16, 2015 – were contained in submissions filed by Hume via the DOC's "IA Access" electronic filing system and sent to the DOC via first-class mail.

199.   In its preliminary decision, published December 4, 2015, the DOC determined that "QTF was not the sole producer of the garlic it reported in its sales database."   The DOC further stated that "the overwhelming majority of QTF's CIQ documentation is not in compliance with PRC regulations demonstrat[ing] that [the DOC] cannot rely on the information the company reported … in its U.S. sales database or in the separate rate questionnaire."

200.   The fraudulent acts to obtain and maintain lower dumping duties enabled QTF to lower its prices and directly caused Plaintiffs to lose market share and see their profits decrease.

201.   As a result of QTF and Hume's participation in the Enterprise's fraudulent scheme, and the resultant flood of fresh garlic sold at less than fair value

into the U.S. market, Plaintiffs have incurred tens of millions of dollars in additional damages between November 1, 2013 and the present.  The resulting lost business to Plaintiffs was the direct and proximate result of QTF's fraudulent behavior.

### D. Defendants Continue Their Unlawful Efforts to Harm Plaintiffs and Strip Zhengzhou Harmoni of Its Favorable Rate.

> i.    *Hume Recruits Crawford to File a Review Request against Zhengzhou Harmoni on Behalf of the Chinese Garlic Association.*

202.   As part of its ongoing efforts to dominate the U.S. market for fresh garlic, the Enterprise has also repeatedly abused the DOC's review process in an attempt to damage Harmoni's reputation amongst its customers and the community and to force Zhengzhou Harmoni to undergo the significant burden and expense of an administrative review and to cause the DOC to revoke the zero cent cash deposit rate Zhengzhou Harmoni enjoys because of its scrupulous compliance with U.S. antidumping regulations.

203.  Specifically, in or around September 2014, Hume, Wang, and the Chinese Garlic Association companies set up a "war chest" for the explicit purpose of destroying Plaintiffs' reputation and business in the United States and replacing Harmoni and Zhengzhou Harmoni's exports with those of the Chinese Garlic Association companies controlled by Bai, Ye, and Wang.

204.   This appeared to be prompted, at least in part, by Zhengzhou Harmoni's refusal in the past to acquiesce to requests by Chinese garlic producers to have their product exported under Zhengzhou Harmoni's zero deposit rate.

205.   In furtherance of this scheme, Hume began seeking out a U.S. garlic farmer to file a review request alleging false and fraudulent information against Zhengzhou Harmoni with the intent of forcing Plaintiffs to pay millions of dollars for Defendants to withdraw the request.

206.   In or around November 2014, Hume convinced Crawford – an author and moonlighting hobby farmer who sells a tiny amount of "artisanal" garlic at a local farmers' market and is not involved in the commercial production of garlic – to submit a request that the DOC review Zhengzhou Harmoni's importation of fresh garlic into the United States.   Hume agreed to represent Crawford *pro bono* in connection with the review request.

207.   Soon thereafter, on November 28, 2014, Crawford, represented by Hume, filed a request to review Zhengzhou Harmoni via electronic filing and first-class mail. The request, which was certified by Hume, was technically made on behalf of Crawford's "El Bosque" farm, a tourist destination comprising two acres of land in northern New Mexico which produces tiny amounts of garlic, shallots, onions, and other vegetables.   El Bosque is not registered in New Mexico, or otherwise, as a business entity or corporation.    As a sole proprietorship, El Bosque has no independent legal identity and lacks standing to sue separate and apart from Crawford.

208.   Until Hume met Crawford by arranging to stay at the El Bosque guesthouse, Crawford had never been involved in the DOC fresh garlic antidumping proceedings, knew nothing about the U.S. antidumping regime, and had never heard of Plaintiffs.

209.   The vast majority of Crawford's artisanal garlic is sold at the Santa Fe Farmers Market, which by regulation only allows sales of local produce, barring Chinese products from being sold at that location.

210.   The garlic raised on the El Bosque farm and sold by Crawford at the Santa Fe Farmers Market bears almost no resemblance to the Chinese garlic sold in bulk by Harmoni in the United States.   It is significantly more expensive to raise and retails for 10-15 times the cost, is grown during a different time of the year, and also has a very different taste.

211.   Moreover, Crawford's garlic does not compete with the garlic imported by Harmoni.   Crawford does not sell garlic to the supermarkets and ethnic stores to

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

40

which Harmoni sells its commercially-produced garlic, and Harmoni is not allowed to sell its imported Chinese garlic at the Santa Fe Farmers market, which explicitly requires that the produce sold there be grown "locally."

212.  Despite Hume and Crawford's knowledge of the significant differences in product characteristics, scale of production and cost between the El Bosque garlic and Harmoni garlic, El Bosque's request falsely averred that it was a "domestic interested party" "producing a domestic like product."

213.  Crawford's request that the DOC conduct an administrative review was in stark contrast to the behavior of the major commercial producers of fresh garlic in the United States, none of whom have pursued a review request of Zhengzhou Harmoni since 2005.

214.  Crawford's request was a transparent effort by Hume and his real clients in interest, including Bai, Ye, and the Chinese Garlic Association (who lack standing to request a review of Zhengzhou Harmoni themselves), to convince the DOC to lift Zhengzhou Harmoni's zero cash deposit rate, making Zhengzhou Harmoni's garlic more expensive and thus reducing its market share and profitability.

215.  On December 30, 2014, while Hume was attempting to convince the DOC that Crawford had standing to request a review of Zhengzhou Harmoni, his Chinese counterpart, Huamei, through Lucy Wang, Du and Zhang, entered an appearance and application for administrative protective order ("APO") on behalf of QTF, QXF, Golden Bird and many other Chinese exporters.  Although filed by Huamei, the address provided with the application was virtually identical to the address for Hume & Associates.

216.  Huamei's request for APO access was denied by the DOC on February 13, 2015, as it was filed on behalf of non-attorney representatives whose primary business practice is outside the United States.

217.  In connection with the review request of Zhengzhou Harmoni, Harmoni's CEO, Mr. Frank Zhou, received a telephone call from Bai on March 13, 2015.  Bai

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

informed Mr. Zhou that he could have an individual he referred to as the "Lawyer" withdraw the review request of Zhengzhou Harmoni.  However, in order for Bai to withdraw the request, Bai demanded that Zhengzhou Harmoni withdraw its complaint against Bai's company, QTF, with the CIQ regarding QTF's forgery of Zhengzhou Harmoni's phytosanitary certificates.  Mr. Zhou refused to commit to withdraw the complaint against QTF before CIQ.

218.  On March 16, 2015, during a second telephone call, Bai assured Mr. Zhou that he would have the "Lawyer," presumably Hume, withdraw the review request of Zhengzhou Harmoni the following day.

219.  The very next day, without explanation, Crawford withdrew his request for an administrative review of Zhengzhou Harmoni, demonstrating his involvement and complicity in the scheme.  Notwithstanding Bai's request for a *quid pro quo*, Zhengzhou Harmoni did not withdraw its complaint to the CIQ, nor cooperate with companies under Bai's control to ship garlic under Zhengzhou Harmoni's zero cash deposit rate.

> ii.  *Submission of Additional Forged Zhengzhou Harmoni Phytosanitary Certificates to the DOC.*

220.  As detailed above, Hume, acting on behalf of Kwo Lee, had submitted forged Zhengzhou Harmoni phytosanitary certificates to the CIT, and later to the DOC, on at least two occasions.

221.  On February 20, 2015, Hume, purportedly acting on Crawford's behalf, filed with the DOC "New Factual Information Concerning Zhengzhou Harmoni" via electronic filing and first-class mail.[3]

222.  In this submission, Hume falsely claimed that Zhengzhou Harmoni was – like Golden Bird or QTF – shipping garlic produced by entities that the DOC had

---

[3]  The February 20, 2015 submission was originally filed on February 5, 2015, without the proper certifications required for a filing with the DOC.

42

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

previously determined were subject to the country-wide rate of $4.71 per kilogram in an attempt to circumvent application of the antidumping rate to those producers.

223. To support this allegation, Hume once again submitted (this time on behalf of Crawford and El Bosque) several examples of what he claimed were Harmoni's phytosanitary certificates. Specifically, Hume and Crawford asserted that the CIQ codes on these certificates belonged to producers assigned the country-wide rate, stating that "Harmoni has been shipping garlic from producers that were assigned the PRC-wide rate, yet evading duties by using its own zero cash deposit rate."

224. The phytosanitary certificates purportedly belonging to Zhengzhou Harmoni and submitted by Hume and Crawford are forgeries obtained by Hume from Huamei and his real clients-in-interest, Bai, Ye, and Wang.

225. The submission, along with the attached forgeries, was submitted through the DOC's electronic filing system, as well as by U.S. mail.

226. Hume and Crawford signed a certification verifying the authenticity and truthfulness of the submission. The certifications state that Hume and Crawford, respectively, were "aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. Government."

227. Although Hume qualified that Crawford was not personally aware of the information contained in the submission aside from the information released under the APO (likely because the information was received from the Chinese Garlic Association through Huamei), Crawford and Hume made these false claims and submitted the forged certificates in furtherance of the Enterprise's scheme to destroy Harmoni's reputation among its customers and the public and to have Zhengzhou Harmoni's zero cash deposit rate revoked in order to increase the Chinese Garlic Association's share of the U.S. market.

228. Each of the participants in the Enterprise, including, *inter alia*, Crawford, Hume, Bai, Ye, Wang and members of the Chinese Garlic Association, stood to

benefit from the conduct of the Enterprise in causing these review requests containing false and fraudulent information to be filed against Harmoni.

> ### iii.  Hume and Montoya Recruit an Additional Hobby Farmer to Submit a Review Request in POR 21 in Furtherance of the Scheme.

229.   In 2015, again with the promise of funds from the purported $1.6 million "war chest," Hume solicited the assistance of Crawford and another hobby farmer, Katz, to file a review request against Zhengzhou Harmoni in POR 21, with the intention of seeking millions of dollars from Plaintiffs in exchange for withdrawal of the request.

230.   On November 28, 2015, Montoya filed a review request in connection with POR 21 against Zhengzhou Harmoni on behalf of an entity identified as the New Mexico Garlic Growers Coalition (the "Coalition") via electronic filing and first-class mail.

231.   The Coalition, which does not appear to have any independent legal existence, has a total of two members: Crawford, who had previously filed a review request against Zhengzhou Harmoni in POR 20, as well as Katz, a subsistence farmer who does not produce garlic on a commercial scale, but rather a small amount of decorative garlic wreaths, completely distinct from the type of commercial garlic produced by Zhengzhou Harmoni.

232.   As was the case for Crawford, until he was solicited to file a review request, Katz had also never heard of Zhengzhou Harmoni or Harmoni.

233.   Montoya represents the Coalition on a *pro bono* basis, while at the same time, Hume continues to represent QTF and his associates at Huamei continue their work on behalf of a number of other Chinese exporters.  This appears to be a conflict.

234.   The Coalition's November 28th review request, along with subsequent filings dated December 3, 2015 and February 22, 2016, contain a number of false and fraudulent statements aimed at destroying Harmoni's reputation amongst its customers

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

and in the community, as well as causing Zhengzhou Harmoni, which has consistently complied with U.S. antidumping laws, to undergo a burdensome and administrative review process and potentially lose its zero rate as a direct result of the fraudulent representations made by the Coalition.

235.   As an initial matter, the Coalition's review request falsely states, *inter alia*, that Zhengzhou Harmoni is affiliated with a company named Jinxiang Jinma Fruits and Vegetables Products Co., Ltd., a company whose exports of garlic are subject to the country-wide rate of $4.71 per kilogram.

236.   The Coalition's review request, like the one filed (and withdrawn) by Crawford in POR 20, is based on a false claim that the farmers produce "domestic like products." They do not. As discussed above, the artisanal garlic grown and sold by Crawford at the Santa Fe Farmers Market bears no resemblance to the commercial Chinese garlic sold by Harmoni. They are completely different products, grown in different ways, sold to different customers at very different price points.

237.   As for the garlic grown and sold by Katz on the 1-2 acres devoted to the bulb, it bears even less similarity to Harmoni's garlic. Katz grows and experiments with a large number of different varieties of garlic, many of which he finds in the wild. They differ greatly from one another in their taste profiles and other characteristics, and they are geared towards connoisseurs and other high-end customers. Moreover, Katz also sells some of the garlic he grows in the form of decorative wreaths and braids. Again, these garlics are completely different products, grown in different ways, sold to different customers at very different price points from the garlic sold by Harmoni. Contrary to Katz's assertion, his specialty garlics, too, are not "domestic like products" and Katz's claim to the contrary is a falsehood meant to damage Harmoni.

238.   On December 3, 2015, the Coalition filed a supplemental submission suggesting that the withdrawal of prior review requests of Zhengzhou Harmoni by the Fresh Garlic Producers Association (the "FGPA"), a trade association made up of

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

domestic producers of fresh garlic, was the result of collusion between the FGPA and Zhengzhou Harmoni.

239.   The December 3rd submission also states that Zhengzhou Harmoni is "gaming" the U.S. antidumping law, and repeats the accusation that Zhengzhou Harmoni "act[s] as an umbrella" for other producers that the DOC had previously determined were subject to the country-wide rate.  This is another falsehood aimed at damaging Harmoni's reputation.

240.   On February 22, 2016, the Coalition filed yet another supplemental submission requesting that the DOC "expeditiously" select Zhengzhou Harmoni as a mandatory respondent in POR 21.  The Coalition fraudulently claims that it "remains committed to ensuring that the domestic industry receives relief."   As discussed above, neither Katz nor Crawford are part of the "domestic industry" and do not produce or sell a "domestic like product."   In addition, the Coalition repeats false claims that it cannot "compete in the United States garlic market" with Plaintiffs' garlic.

241.   The December 3rd submission, the February 22, 2016 submission, and original review request were filed electronically and by first-class mail with the DOC.

242.   Both Crawford and Katz, along with Montoya, verified the authenticity of the November 28th, December 3rd, and February 22nd submissions.  As with Hume and Crawford's February 20, 2015 certifications, each of these certifications states that Defendants are "aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. Government."  If not enjoined, Defendants will continue to file additional false submissions to the DOC with similar false and defamatory allegations against Harmoni.

243.   Like Crawford's withdrawn 2014 review request, the Coalition's 2015-2016 request and submissions constitute another effort by Defendants to force a costly and burdensome review of Zhengzhou Harmoni by the DOC and (should the DOC

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

ascribe any credence to the false allegations levied as part of each of these requests) possibly result in the imposition of a non-zero cash deposit rate on Zhengzhou Harmoni's fresh garlic shipments on behalf of the Chinese garlic producers who lack standing to request such a review themselves.

244.   The Coalition's false and fraudulent requests and submissions were made in bad faith and solely for the purpose of defaming and injuring Harmoni.  They did not serve as a necessary or useful step in any legitimate DOC review process.

245.   The Enterprise also intends that the cost and burden of this administrative review and the risk that the DOC will ascribe credence to their forged and fraudulent submissions will force Plaintiffs to provide Defendants with an extortionate payment in the sum of millions of dollars to withdraw those review requests.  Absent injunctive relief, it is likely that these efforts will continue.

246.   As a result of the fraudulent statements contained in Crawford and Katz's public submissions, Harmoni's business reputation has been harmed.   In addition, Harmoni has incurred significant expenses, including legal fees, in defending itself from baseless threats of administrative review and the fraudulent statements made regarding its business practices to the DOC.

### E. Defendant C Agriculture Attempts to Extort Millions of Dollars from Harmoni.

247.   C Agriculture, a corporation based in New York, buys garlic from importer companies and resells it directly to American consumers, including consumers located in California.

248.   Historically, C Agriculture has purchased a significant percentage of its garlic supply from Chinese corporations affiliated with Bai and Wang, including Golden Bird, QTF, and Kwo Lee.

249.   On November 18, 2015, attorney James J. DeCristofaro sent a letter to Harmoni on behalf of C Agriculture.

47

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

250.   In the letter, C Agriculture alleges that Harmoni and one of its major customers, Christopher Ranch, "acted together" in order to sell peeled garlic "at a price significantly below the U.S. market price for peeled garlic," and that this "arrangement" constitutes an "unreasonable restraint of trade" that violates the antitrust laws.

251.   In addition, C Agriculture asserts that Christopher Ranch "received garlic imports from China processed with prison labor," presumably from Harmoni.

252.   The letter concludes by demanding that Harmoni pay C Agriculture a sum of $32 million in order to stave off a lawsuit which would make public these baseless, false, and defamatory claims.

253.   The letter was sent to Harmoni and Christopher Ranch via Federal Express.

254.   C Agriculture made these false claims in an effort to defame and extort Harmoni.

255.   In addition to being defamatory, C Agriculture's letter, which copies Christopher Ranch, one of Harmoni's largest customers and a member of the FGPA, constitutes an attempt to tortiously interfere with the contractual relationship between Christopher Ranch and Harmoni.

256.   Moreover, as C Agriculture is aware, selling goods processed using prison labor is illegal in the United States.   Accordingly, C Agriculture's letter constitutes a threat to publicly accuse Harmoni of a crime it did not commit unless Harmoni pays it $32 million, making it extortionate in nature.

257.   C Agriculture had no good faith intention to actually file a lawsuit against Harmoni and/or Christopher Ranch, and, in fact, did not.  The letter was made solely for the purpose of defaming Harmoni and damaging its relationship with its customers, as well as for the purpose of extorting Harmoni, and did not serve as a necessary or useful step in any litigation process.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

HARMONI INTERNATIONAL SPICE, INC. AND ZHENGZHOU HARMONI SPICE CO., LTD.'S FIRST AMENDED COMPLAINT

258.   C Agriculture's principals and management, Defendants Wen and Xu, played an active role in the subject defamation and attempted extortion.   Both have close business ties to Bai and Ye, and have employed Hume as counsel in prior matters.

## FIRST CLAIM FOR RELIEF

### (Violation of RICO - 18 U.S.C. § 1962(c) - Against All Defendants)

259.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 258 of this Complaint.

260.   Plaintiffs, and each of them individually, are "persons" as defined in 18 U.S.C. § 1961(3).

261.   Defendants, and each of them individually, are "persons," as that term is defined in 18 U.S.C. § 1961(3).

262.   The RICO "Enterprise" is an ongoing and continuing association-in-fact consisting of Defendants, formed for the common or shared purpose of fraudulently increasing Defendants' market share in the United States for fresh garlic and injuring Plaintiffs through unlawful and illegal activities.   The Enterprise engages in and its activities have an effect on interstate commerce.

263.   Each Defendant is associated with the Enterprise and participated directly or indirectly in the management or direction of the Enterprise within the meaning of 18 U.S.C. §§ 1961(4), 1962(c).

264.   The specific internal corporate mechanisms and operations by which Defendants carried out their fraudulent scheme, and the specific activities engaged in by Defendants in furtherance of their fraudulent scheme, are within the exclusive knowledge and understanding of those within Defendants' conspiracy, including Hume.   To date, given the far-reaching, complex, and clandestine nature of Defendants' fraudulent scheme, Plaintiffs have only been able to gather limited information regarding some aspects of the fraudulent scheme.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

265.   Defendants, and each of them, violated RICO when they conducted or participated in the affairs of Defendants' Enterprise through a pattern of racketeering activity, by making fraudulent statements regarding Plaintiffs' business intended to injure Plaintiffs' market position, and through other fraudulent acts and unfair and illegal business practices.

266.   The predicate acts of wire and mail fraud under 18 U.S.C. §§ 1343, 1341 and extortion under Cal. Penal Code 518-527 constitute a pattern of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), (5).

267.   Beginning no later than November 2009 through the present, Defendants, and each of them, used the U.S. mails and interstate and international wire facilities to perpetrate their fraudulent scheme to injure Plaintiffs.

268.   Specifically, and in furtherance of their ongoing fraudulent scheme, Defendants, and each of them, submitted or caused to be submitted, via interstate telephone wires, and through the U.S. Postal Service or other private or commercial interstate carrier, fraudulent statements designed to severely injure Zhengzhou Harmoni's reputation and strip it of its zero cash deposit rate with the DOC.  As detailed above, these statements were made to the DOC, Customs, the CIT, and to Harmoni's customers, including Christopher Ranch.  Defendants intentionally mailed or caused to be mailed the fraudulent statements, on a regular and routine basis, with the intent to injure Plaintiffs and profit themselves.

269.   Defendants also solicited various individuals to join the Enterprise and extort millions of dollars from Plaintiffs in return for withdrawal of review requests, while Hume solicited legal fees to fund the illegal schemes.

270.   At a minimum, Defendants submitted fraudulent statements via the U.S. Postal Service, Federal Express, and e-mail communications on the following dates:

- On May 10, 2014, Hume and Golden Bird submitted fraudulent statements to the DOC via the DOC's electronic filing system and first-class mail;

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

- On May 17, 2014, Hume and Golden Bird submitted fraudulent statements to the DOC via the DOC's electronic filing system and first-class mail;

- On May 20, 2014, Hume and Golden Bird submitted fraudulent statements to the DOC via the DOC's electronic filing system and first-class mail;

- On May 23, 2014, Hume and Golden Bird submitted fraudulent statements to the DOC via the DOC's electronic filing system and first-class mail;

- On October 2, 2014, Hume and QTF submitted fraudulent statements to the CIT via the CIT's case management and electronic court filing system;

- On November 28, 2014, Hume and Crawford submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail;

- On February 2, 2015, Hume and QTF submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail;

- On February 20, 2015, Hume and Crawford submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail;

- On May 5, 2015, Hume and QTF submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail;

- On May 20, 2015, Hume and QTF submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail;

- On November 16, 2015, Hume and QTF submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail;

- On November 18, 2015, C Agriculture sent a letter via Federal Express to Harmoni and Christopher Ranch containing defamatory and extortionate statements;

- On November 28, 2015, Montoya, Crawford, and Katz submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail; and

- On December 3, 2015, Montoya, Crawford, and Katz submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail.

- On February 22, 2016, Montoya, Crawford, and Katz submitted fraudulent statements to the DOC via electronic filing and sent via first-class mail.

271.   Each of the specific communications delineated above constitutes a separate RICO predicate act under 18 U.S.C. § 1343 or 18 U.S.C. § 1341.

272.   At all relevant times, Defendants carried out their fraudulent scheme through other agents and employees of Defendants, working across state and national boundaries, who necessarily relied upon the frequent transfer of documents and information and funds by the U.S. mails and interstate wire facilities.  The nature and pervasiveness of the Enterprise necessarily required communications directly and frequently by the U.S. mails and interstate wire facilities.

273.   In addition, the letter sent by C Agriculture constitutes extortion under California state law.  *See* Cal. Penal Code §§ 518-527 ("Extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."). State law extortion constitutes a RICO predicate act.

274.   Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs to be injured in their business and property, including in an amount of lost profits to be determined at trial.  These injuries were proximately caused by Defendants' actions which were targeted at Plaintiffs and no one else.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

275.   This Claim is brought under 18 U.S.C. § 1964(c) of RICO, under which Defendants are jointly and severally liable to Plaintiffs for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees and expenses.

## SECOND CLAIM FOR RELIEF

### (Unfair Competition – Cal. Bus. & Prof. Code §§ 17200 *et seq.* - Against All Defendants)

276.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 258 of this Complaint.

277.   Defendants have used fraudulent and improper means to increase their share in the U.S. market for fresh garlic.  Defendants have also used fraudulent and improper means to injure Plaintiffs' business and, as a proximate result of Defendants' fraudulent statements and actions, Defendants will divert and take away, or are attempting to divert and take away, the business of Plaintiffs and their existing customers.

278.   Defendants have engaged in unlawful conduct, including violations of RICO and conduct that constitutes trade libel under California law.

279.   By virtue of the acts and omissions of Defendants, they have engaged in fraudulent, unlawful, and unfair conduct that constitutes unfair competition within the meaning of California Business and Professions Code § 17200, thereby entitling Plaintiffs to injunctive and restitutionary relief as provided by California Business and Professions Code § 17203.

280.   The aforementioned acts of Defendants were willful, oppressive, and malicious, in that Defendants unfairly competed with Plaintiffs with the deliberate intent to injure Plaintiffs' business.  Plaintiffs are therefore entitled to payment of damages in a sum sufficient to punish Defendants and to set an example and deter such conduct in the future.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

281.   As a direct and foreseeable result of Defendants' violation of California Business and Professions Code § 17200, Plaintiffs have suffered and will continue to suffer substantial irreparable harm, including but not limited to the harm caused by further fraudulent statements made with the intent to injure Plaintiffs' business and reputation.   Unless enjoined, Defendants will inflict great and irreparable harm, including through further dissemination of false statements regarding Plaintiffs' business and reputation.

## THIRD CLAIM FOR RELIEF

### (Unfair Competition – California Common Law - Against All Defendants)

282.   Plaintiffs re-allege and incorporate herein by reference the allegations of paragraphs 1 through 258 of this Complaint.

283.   Defendants have repeatedly made false statements in an attempt to interfere with Plaintiffs' business and customer contracts in order to unfairly compete with Plaintiffs.

284.   As a proximate result of the unfair competition by Defendants, Defendants have diverted and taken away the business of Plaintiffs and are attempting to deprive Plaintiffs of their existing and future customer contracts.   As a proximate result of this unfair competition by Defendants, Plaintiffs suffered damages in a sum not presently ascertainable but in an amount to be proven at trial.

285.   As a direct and foreseeable result of Defendants' unfair competition, Plaintiffs have suffered and will continue to suffer irreparable harm, including but not limited to further fraudulent statements made with the intent to injure Plaintiffs' business and to deprive Plaintiffs of their legitimately obtained competitive advantage. Defendants will inflict great and irreparable harm, including the further dissemination of false statements regarding Plaintiffs' business.   Plaintiffs' remedy at law is not by itself adequate to compensate it for the harm inflicted by Defendants.   Accordingly, Plaintiffs are entitled to injunctive relief.

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

286.   The aforementioned acts of Defendants were willful, oppressive, and malicious in that Defendants seek to unfairly compete with Plaintiffs with the deliberate intent to injure Plaintiffs' business.   Plaintiffs are therefore entitled to payment of damages in a sum sufficient to punish Defendants and to set an example and deter such conduct in the future.

### FOURTH CLAIM FOR RELIEF

### (Trade Libel - Against All Defendants)

287.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 258 of this Complaint.

288.   As noted above, Defendants made and continue to make false statements of fact that have disparaged Harmoni and Zhengzhou Harmoni.   In addition to the letter sent by C Agriculture, each submission by Hume, Montoya, and other Defendants to the DOC were also sent to Plaintiffs' customers, in particular Christopher Ranch and The Garlic Company.   Statements contained in the letter and submissions by Defendants, and each of them, are provably false.

289.   Defendants will perform further acts of disparagement and unless Defendants are restrained by appropriate injunctive relief, Plaintiffs will continue to suffer immediate, irreparable, and incalculable loss of revenue and harm to their business reputation, goodwill, and to the integrity of their operations, for which there is no adequate remedy at law.

290.   As a direct and proximate result of Defendants' trade libel, Plaintiffs have suffered pecuniary loss in an amount to be proven at trial.   In particular, Defendants' disparaging and libelous comments have caused Plaintiffs' customers to reconsider their use of Plaintiffs' services.

291.   The aforementioned disparagement was willful, wanton, and malicious in that it was specifically and intentionally undertaken to injure Plaintiffs' financial position, deprive Plaintiffs of the benefits derived from its goodwill and reputation,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

and strengthen Defendants' position in the marketplace.   Plaintiffs are therefore entitled to exemplary damages against Defendants in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

**(Tortious Interference with Contractual Relations - Against All Defendants)**

292.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 258 of this Complaint as set forth above.

293.   Valid contracts existed and exist between Harmoni and all of its customers, including Christopher Ranch.  At all material times, Defendants were and are aware that Harmoni had and has contractual relationships with these customers.

294.   Defendants intentionally submitted fraudulent statements to Harmoni's customers in an effort to encourage Harmoni's customers to breach their contracts with Harmoni.

295.   Defendants intended to harm Plaintiffs financially and to induce customers of Harmoni to sever their relationship with Harmoni.  Defendants' conduct has provided Defendants with an unfair business advantage and constitutes an unfair business practice in violation of California Business & Professions Code § 17200.

296.   Defendants will continue to interfere with Plaintiffs' contractual relations and unless Defendants are restrained by appropriate injunctive relief, Plaintiffs will continue to suffer immediate, irreparable, and incalculable loss of revenue and harm to their business reputation, goodwill, and to the integrity of their operations, for which there is no adequate remedy at law.

297.   As a proximate result of the wrongful acts of Defendants, Plaintiffs have sustained and will continue to sustain damages.  The precise nature and amount of such accrued and continuing damage is not known by Harmoni and cannot be ascertained by it at the present time, but such damages are on information and belief substantial and susceptible to being proven at trial.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

298.   Defendants engaged in interference with Harmoni's contractual relationships with its customers maliciously, oppressively, and with a wanton disregard of Harmoni's rights.   Plaintiffs are therefore entitled to the payment of damages in a sum sufficient to punish Defendants, to set an example and to deter such conduct in the future.

## SIXTH CLAIM FOR RELIEF

### (Intentional Interference With Prospective Economic Advantage - Against All Defendants)

299.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 258 of this Complaint as set forth above.

300.   An economic relationship exists between Harmoni and its customers, including Christopher Ranch, containing probable future economic benefit or advantage to Harmoni.

301.   Defendants knew of the existence of these relationships between Harmoni and its customers.

302.   Defendants intentionally engaged in wrongful conduct designed to interfere with or disrupt the relationship between Harmoni and its customers.

303.   Defendants intended to interfere or disrupt the relationship between Harmoni and its customers in order to lure Harmoni's customers to do business with Defendants instead.   Defendants' conduct has provided them an unfair business advantage over Harmoni and constitutes an unfair business practice in violation of California Business & Professions Code § 17200.

304.   Defendants actually interfered with the economic relationship between Harmoni and its customers.

305.   As a proximate result of the wrongful acts of Defendants, Harmoni has suffered and will continue to suffer substantial damages.   The precise nature and amount of such accrued and continuing damages is not known by Harmoni and cannot

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

be ascertained by it at the present time, but such damages are on information and belief substantial and susceptible to being proven at trial.

306. Defendants will continue to interfere with Plaintiffs' prospective economic advantage and unless Defendants are restrained by appropriate injunctive relief, Plaintiffs will continue to suffer immediate, irreparable, and incalculable loss of revenue and harm to their business reputation, goodwill, and to the integrity of their operations, for which there is no adequate remedy at law.

307. Defendants engaged in interference with Harmoni's contractual relationships maliciously, oppressively, and with a wanton disregard of Harmoni's rights. Plaintiffs are therefore entitled to the payment of damages in a sum sufficient to punish Defendants, to set an example, and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Plaintiffs Harmoni International Spice, Inc., and Zhengzhou Harmoni Spice Co., Ltd. pray for relief as follows:

1. Recovery of actual damages from Defendants according to proof at trial;

2. A preliminary and permanent injunction enjoining Defendants from engaging in unfair, fraudulent, and unlawful activity, from interfering with Plaintiffs' business, and from engaging in conduct that constitutes trade libel;

3. Recovery of restitution from Defendants in an amount to be determined at trial, and/or any interest in money or property, which may have been acquired by means of Defendants' unfair competition or other unlawful acts;

4. Where appropriate under the claim for relief alleged, an award of punitive damages from Defendants;

5. An award of treble damages pursuant to 18 U.S.C. § 1964 (RICO) from Defendants;

6. Attorneys' fees incurred in connection with this action;

7. Costs incurred in connection with this action; and

8. Such other and further relief as the Court deems just and proper.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Dated:  March 4, 2016                    WINSTON & STRAWN LLP


                                         By:  /s/  John E. Schreiber
                                              John E. Schreiber
                                              Jeffrey L. Kessler
                                              A. Paul Victor
                                              George E. Mastoris

                                              *Attorneys for Plaintiffs*
                                              *HARMONI INTERNATIONAL*
                                              *SPICE, INC. and ZHENGZHOU*
                                              *HARMONI SPICE CO., LTD.*


        Plaintiffs Harmoni Spice International, Inc. and Zhengzhou Harmoni Spice Co.,
Ltd. hereby request trial by jury pursuant to Fed. R. Civ. P. 38(b).


Dated:  March 4, 2016                    WINSTON & STRAWN LLP


                                         By:  /s/  John E. Schreiber
                                              John E. Schreiber
                                              Jeffrey L. Kessler
                                              A. Paul Victor
                                              George E. Mastoris

                                              *Attorneys for Plaintiffs*
                                              *HARMONI INTERNATIONAL*
                                              *SPICE, INC. and ZHENGZHOU*
                                              *HARMONI SPICE CO., LTD.*

HARMONI INTERNATIONAL SPICE, INC. AND ZHENGZHOU HARMONI SPICE CO., LTD.'S FIRST AMENDED COMPLAINT